other, but it must be adopted by resolution. 1 Swift, 71; 2 Conn. 579. And it must be named in the attestation clause of the deed.

By the COURT:

The paper offered in evidence purports to be a conveyance from the president and directors of the Miami Exporting Company as grantors. It is executed by O. M. Spencer as president, in his own name and under his own seal as president. The grantors named in the deed do not execute it. The person who executed it had no interest in the subject conveyed, and is not named as grantor in the deed. It is, therefore, no conveyance. The motion for a new trial is overruled, and judgment entered on the verdict.

Judge BURNET, being a stockholder in the Miami Exporting Company, did not sit in this case.

---

395] *LESSEE OF BOND v. SWEARINGEN.

*Conveyance for Gaming Consideration—Attachment—Sale by Auditors—Ancestor and Heir—Estoppel.*

Estate forfeited to heirs by conveyance for gambling debt may be taken by heirs, subject to the debts of the grantor.

Whether the grantor in a voluntary deed be indebted at the time of the grant is a fact to be found by the jury.

If lands are located and surveyed by an ancestor, and patented to heirs, they take by descent.

Heirs taking by descent are estopped by the deed of their ancestor.

THIS was an action of ejectment, and came before the court upon a motion for a new trial, made by the plaintiff, and reserved in the county of Ross. As the opinion and decision of the court is confined altogether to the title of the defendant, so much only of the statement of the case, and the argument of the counsel, as relate to that title, are presented.

The suit was brought to recover a lot in the town of Chillicothe. The tract of land, including the lot in question, was entered by N. Massie on the 27th of June, 1795, as in his own right—

404

was surveyed on the 24th of December, 1796, and the plat and certificate of survey recorded in the surveyor's office, June 9, 1797.

On the 21st day of September, 1797, Nathaniel Massie conveyed the lot in question to Basil Abrams, by deed of general warranty.

Basil Abrams, on the 21st of May, 1801, conveyed the lot in question to John S. Wills, by deed of general warranty, for a consideration expressed of $1,200. The real consideration was, as proved and admitted at the trial, that Wills won the lot of Abrams at a game of billiards.

Soon after the execution of this deed Basil Abrams left the country to which he never returned. On the 15th of February, 1802, an attachment against B. Abrams, as an absconding debtor, was sued out of the common pleas of Ross county, and levied upon the lot in question, upon which such proceedings were had that the lot was sold by auditors, and regularly conveyed, under which conveyance the defendant claimed.

The debts of Basil Abrams, as found and certified by the auditors, amounted to $1,999.22.

In the year 1811, Nathaniel Massie deceased, leaving several children his heirs at law. After his death it was discovered that no patent had issued for the tract of land in which the lot is included, and a patent was obtained to his heirs, dated 31st December, 1814.

*Upon the trial of the cause before the supreme court of [396 Ross county, the jury found a verdict for the defendant, and a motion was made for a new trial, upon the ground that the verdict was against law. The decision of the motion rested altogether on the validity of the defendant's title.

LEONARD, for the plaintiff:

The defendant's title rests upon the proceedings in attachment, and they can avail nothing unless the lot was the property of Basil Abrams, liable to his debts at the time the attachment issued.

The deed from Abrams to Wills, made on the 21st of May, 1801, was for a gambling consideration. The law of the territory, then in force, provided, that any conveyance made to satisfy or secure money, or other thing, won of the vendor, should inure to the use of the heir of the vendor, and should vest the whole estate and

405

interest of such a person in the lands sold, to all intents and purposes, in the heir of the vendor, as if such vendor had died intestate.   By force of this law, the deed to Wills operated to divest Basil Abrams of title, and to vest that title in Eleanor Abrams, his heir.

But it is asserted that the heir took the estate subject to the debts of Basil Abrams, and, therefore, it was liable to be taken in attachment for his debt.   Upon what principle is this doctrine founded ?   There is no provision saving the rights of creditors, and can the court interpolate such a provision ?

In England there are many cases where the commission of crimes operated a forfeiture of estates.   Such laws, too, have prevailed in some of the states of this Union; but in none of these cases does the fact of the felon being in debt overreach the forfeiture for the protection of the creditor; at least I have been able to find no case where a creditor has set up a right to pursue an estate so forfeited.

If, however, the heir in this case took the estate subject to the debts of Basil Abrams, are the proceedings in attachment evidence against the heir upon that point ?

The heir, whose rights are to be affected, was no party to the proceedings; they were *res inter alios actæ;* he can *only be affected by a decision in a case where he was a party.   He had a right to a day in court to contest the justice of the debts, and if charged upon the estate in his hands, he should have an opportunity to save his estate by paying the debts.

Evidence of the indebtedness of Abrams was adduced at the trial, but could the right of the heir in whom the law vested the estate be thus collaterally assailed ?   The estate having vested in him might be charged with the debts by legal process; but until so charged the title remained where the law cast it.   The fact of Abrams being in debt would not divest the estate out of the heir, unless it was charged with the debt in a legal manner, and the title transferred legally in discharge of the debt.   The parol evidence given, that Abrams was at the time indebted, could not affect the title.

There are two exceptions to the auditor's deed, under which the defendant claims.   There should have been proof that the lot would not rent for sufficient to pay the debt in seven years; and

also proof that legal notice of the time and place of sale was given. ' 3 Territorial Laws , 15, 16 ; 1 Ohio, 27.

It is alleged that the notice at this distant day should be presumed. It is replied that the heir at law, upon whom the estate was cast, was a minor at the time the estate was vested, and has but a short time since attained her majority.

But long since all these proceedings, the grant creating the legal title to the tract of land, including this lot, issued to the heirs of Nathaniel Massie. By the grant the legal title vested in the patentees, from whom the defendant deduces no title. The legal title can not be affected by proceedings had before it was in existence.

It is understood that the defendant insists that the title vested in Massie's heirs, by the patent, inures for the benefit of those claiming under deed made by Massie so as to vest, in all such, an operative legal title. This can not be the case : because the legal title comes to the heirs of Massie, by purchase, and not by descent. The term *heirs* used in the patent, is merely descriptive ; it can upon no principle be taken as a term of limitation.

*It has justly been remarked that " words of purchase," [398 and " words of limitation," have been good clients in Westminster Hall ; and there is no doubt that if once introduced into our courts, they will be good clients here. The line that divides them is described by

" Hooks, angles, crooks, and involutions wild,"

and the cases in which they have been agitated are truly of a " multiplicity and incongruity " most appalling. But there is no case, in which, where a title emanates directly, and originally from the sovereign to the heir, that the grantee has been considered as in by descent.

The question whether the heir shall take by *descent* or by *purchase* only arises when an estate is created in the ancestor and limited to the heir by the *same conveyance.* For even in Shelly's case it is admitted that if an estate be conveyed to the ancestor for life, by one conveyance, and the remainder be conveyed to the heir, by a separate conveyance, the heir takes as purchaser. And, in the principal case, the right of Edward Shelly and his heirs male was derived from the same common recovery. So in Wood's case, stated by the defendant's counsel in Shelly's case, the covenant, upon a certain event, to stand seized of lands to the use of the covenantee and his heirs, was the foundation of the title of *both.* The

same conveyance created the estate of ancestor and heir—and it could make no difference, as the estate was in its nature contingent, that the ancestor died before the event happened upon which it vested in possession. Its original character remained the same as if that event had happened in the lifetime of the covenantee, or ancestor. In the case stated of an exchange of land, the exchange is supposed to be made by conveyance, containing words of limitation to heirs general or special; indeed the whole doctrine, perplexed and vexatious as it certainly is, has no application to any case other than where an estate is derived to *ancestor* and *heir* from the *same conveyance.* That is not the case here. However, the estate of the heirs of Massie derived to them as heirs under the grant from the government, may be predicated upon the original interest of their ancestor, yet they do not take the legal title by descent, but by purchase.

The rights of purchasers under Massie, or his creditors, are in no **399]** other way affected by the doctrine we maintain, *than that their rights must be secured by a court of equity, instead of a court of law.

Where the ancestor has paid the consideration, and the heir receives the conveyance, although he must necessarily take as a purchaser, because the estate is not so derived that he can take by descent, yet, in equity, the estate is assets for the payment of debts; and if the ancestor had made a contract to sell, the heir taking the title would, in equity, be deemed a trustee for the purchaser. It might be more convenient, in such case, to adjudge the heir in by descent, so that where the ancestor had conveyed, the title might inure. But this would be establishing a new doctrine, which, to say the least, might introduce as many mischiefs as it would remedy.

If, then, the heirs of Massie took the legal title by purchase and not by descent, the defendant's title is incomplete.

BRUSH and FITZGERRALD, for the defendant:

The deed from Basil Abrams to Wills was a voluntary conveyance, made without any consideration to sustain it. If by operation of law it divested Abrams of his estate, and instead of carrying that estate to the grantee, transferred it to the heir of Abrams, this effect did not change its character as a voluntary conveyance,

and therefore as against the creditors of Abrams it was void, under the statute of Elizabeth then in force in this country.

But if it were not void against creditors as a voluntary deed, yet the heir who took the estate must take it subject to the debts of the grantor then due. For had the estate vested in consequence of the death of the ancestor, the heir would have taken subject to those debts. And the law, which casts the estate upon the heir, casts it upon him in terms, for *every intent and purpose* the same as if the grantor had died intestate.

There was no necessity to make the heir party to the proceedings against Basil Abrams. The attachment against him reached every interest which he had held, that was liable to the payment of his debt. He was *in esse* and competent to appear and defend the suit. If he did not do so, *the heir is bound by the judg- [400 ment against him, and is estopped to deny its effect. 1 Salk. 276.

It is objected that the sale by the auditors is invalid, because it does not appear that the lot would not rent for sufficient to pay the debts in seven years. An inquest for this purpose was unnecessary; the property was valued under the attachment law, and the whole valuation was considerably less than the debt.

The case is not like that of Patrick, Lessee, *v.* Osterout, 1 Ohio, 27, quoted by the other side. Here was a valuation or appraisement, and it appears in the record. The attachment law only requires that the court shall be satisfied that the property will not rent, and of this the valuation left no doubt. The order for effecting the sale is conclusive upon that point.

With respect to the proof of notice, that is not a fact which can affect the sale. In the case of Wheaton *v.* Sexton, 4 Wheat. 506, the court say: "The purchaser depends on the judgment, the levy, and the deed. All other questions are between the parties to the judgment and the marshal. Whether he makes a correct return, or any return at all, to the writ is immaterial to the purchaser, provided the writ was duly issued and the levy made before the return."

DOUGLAS, on the same side:

The defendant being fairly and fully invested with all the right conveyed by N. Massie to Basil Abrams, is possessed of the legal estate, in virtue of the grant to Massie's heirs, which inures to his benefit under the covenant of warranty in the deed from Massie to

Abrams. The opinion of Judge Swan, in the case of Tabb and Massie's heirs, is full to this point, and though not an authority in this court, is entitled to weight and consideration, both for argument and research.

The same decision was made, on the same point, in the case of Johnson *v.* Miller's and Massie's heirs, in the United States Circuit Court, after keeping the case under advisement for twelve months.

Independent of authority, there would seem to be one plain practical principle which must test the question. If, in a suit **401]** against them upon a bond of their ancestor, in *which they were named, the heirs of Massie should plead *rein per descent*, and a replication of assets, setting out the title of Massie, and of the heirs in these lands, would this replication be bad upon demurrer? If such replication would be bad, the heirs would take the estate discharged of the ancestor's debts; if good, their actual interest in the land descends from him, and his acts must be as operative upon them, as they could have been upon himself.

It is a well settled rule that a man can not, "either by conveyance at the common law, or by limitation of uses or devise, make his right heir a purchaser." Vent. 372. And in all cases where an estate vests in the ancestor, the heir takes the same estate by descent. Blackstone lays it down that if the ancestor *"die before entry,* still his heir shall take by descent, not by purchase; *for where the heir takes anything that might have vested in the ancestor, he takes by descent, and not by purchase."* 2 Com. 242. In this case the right originated in the ancestor, and the legal title might have vested in him. For the same consideration it is vested in the heir, who must be considered as holding by descent.

It is generally agreed that the short amount of the rule in Shelly's case is this, "that no man shall raise in another an estate of inheritance, and at the same time make the *heirs* of that person *purchasers.*" A rule of which Mr. Justice Blackstone remarked, "that no court of justice in the kingdom had the power, or (he trusted) the inclination to disturb."

The question *of descent or purchase in Shelly's case* arose under a common recovery, in which Edward Shelly, the recoverer, deceased after judgment, but before the emanation of the writ of seizin. Richard Shelly, to whom the use was limited by the recovery, as heir male to the recoveree, entered and although no estate ever vested in Edward Shelly under the recovery, yet it was

adjudged that Richard took by descent from his ancestor Edward, and not by purchase.

As the recovery in this case was incomplete, and constituted but an inchoative title until the execution of the writ of seizin, it is supposed to be strikingly analogous to this case, in which the inchoative right was in the ancestor, and perfected in the heir after his death by the grant. The *principle being, that where [402 the heir takes that which his ancestor, if alive, would have taken, he is in by descent. This is recognized as the correct doctrine in Jenkins, 249; 14 Vin. 269; Sir T. Jones, 59; Coke Lit. 229; 8 Mod. 23; 3 Bibb, 2; 12 Johns. 318; 14 Johns. 405.

The heirs of Massie, taking by descent from him under the grant, are estopped from disputing the title in their ancestor, hence their title inures to the benefit of his grantee. Barr v. Gratz, 4 Wheat. 222; 4 Bibb, 536; 1 Salk. 276; Coke Lit. 352, a.

Opinion of the court, by Judge SHERMAN:

The result of the motion for a new trial in this cause must depend upon the question, which of the parties has a valid legal title to the premises in question. The defendant has obtained a verdict, and that verdict ought not to be set aside if his title papers, connected with the evidence in the cause, show a subsisting legal title in him. In order to determine this question, it is necessary to ascertain the effect of the deed from Basil Abrams to John S. Wills, of May 1, 1801; the proceedings had under the attachment, at the suit of Reuben Abrams against B. Abrams, and the grant by the government of a tract of land, including the premises in controversy, to the heirs of Nathaniel Massie, deceased.

The deed from B. Abrams to J. S. Wills, of the lot in question, dated May 1, 1801, is admitted to have been executed upon a gambling consideration.

By the act of the territorial government, then in force, entitled "a law to suppress gaming," it is provided, "that all conveyances, etc., made for a gambling consideration, shall inure to the use of the heir of the bargainer, etc., and vest the whole estate, and all the interest of such person in the land so bargained, to all intents and purposes, in the heir of the bargainer, the same as if the bargainer had died intestate."

It is believed that this act of the territorial government has never received a construction by our courts.

It is contended by the plaintiff's counsel, that the lot in question, by virtue of this act, became forfeited to the heirs of B. Abrams 403] upon the execution of the deed from him to *Wills, and that they took the same discharged from all liability for his debts.

In the opinion of the court this construction is neither warranted by the words nor intent of the law. The legislature can, without doubt, attach forfeitures to the commission of offenses, and such forfeitures may be general, including all the property of the offender, subject only to actual liens, or limited in amount or kind, and restricted by provisions for the benefit of creditors and others. Whatever may be the nature or kind of forfeiture, it is never carried by construction beyond the clear expression of the statute creating it.

When a deed is founded on a gambling consideration, the statute vests in the heir of the bargainer all his interests to all intents and purposes, the same as if such bargainer had died intestate; the law considers the bargainer *per hoc vice* as dead; the heir takes the same as if the ancestor, instead of executing the conveyance, had that moment died. The estate does not become forfeited, but the grant is to inure to the benefit of the heir of grantor, and he takes the lands mentioned in the conveyance by virtue of the statute, the same as he would had they descended to him by the death of the ancestor. He takes as heir, and not as the grantee of government of a forfeited estate. The property vesting in him as heir, he necessarily takes with all the responsibilities and liabilities attached to that relation. The expression of the statute that the interest of the bargainer shall vest "in the heir the same as if the bargainer had died intestate," would be rendered vain and useless by any other construction than that the land so coming to the heir shall in his hands be subject and liable to all claims that it would had it descended to him by the death of the bargainer.

The construction contended for by the plaintiffs would work manifest injustice in many cases. An individual who had obtained credit, and become indebted, could not well devise a more ready and easy way of protecting his property from his creditors than by conveying the same for a gambling consideration, if such conveyance was to inure to the use of his heirs, the natural objects of his care and bounty, to the exclusion of the claims of his creditor. 404] The expression *of a law should be clear, and the intent manifest, before a court could be justified in giving it a construction

that would obviously protect fraud and deprive creditors of their just claims upon the property of the debtor, and such would be the effect of this law, if the construction contended for by the plaintiffs should prevail. The heirs of B. Abrams would hold this estate as forfeited to them by the act of their ancestor, free from any liability to the claims of his creditors. We are satisfied such was not the intent of the territorial government in adopting this law; but that it was intended to protect the improvident from gambling away their property to the injury of their creditors and heirs, and that to effect this purpose the statute prevents all lands conveyed for a gambling consideration from vesting in the grantee named in the deed, but makes such deed inure to the use of the heir of the grantor, so that he shall take the lands subject to the same liabilities he would, had he inherited them in the usual course of descent.

It will be perceived upon the perusal of this statute that it nowhere expressly prohibits gaming, or subjects persons guilty thereof to any species of judicial prosecution, and it is difficult to perceive how a forfeiture of lands should result from the doing of an act neither prohibited nor punished.

At the time Basil Abrams executed the deed to J. S. Wills for a gambling consideration, the real, as well as personal estate of the debtor, was subject to the payment of his debts. If he was living, his real estate, if it would not extend in seven years for sufficient to satisfy the judgments against him, might be levied on, and sold. And in case of his dying intestate, the whole real estate of which he died seized, and which of course descended to his heirs, might, if necessary, be sold by the order of the court of probate for the payment of debts, or the judgment creditor might enforce a sale.

The heir took the estate with this legal liability or incumbrance attached thereto, and had B. Abrams died on the 1st May, 1801, the day of the date of the deed to J. S. Willis, without executing that deed, the lot now in question would have descended to Eleanor, his heir, subject to the payment of his just debts. The territorial law gave to the heir of a grantor for a gambling consideration no greater interest in the lands conveyed than if the same lands had 405] come to the *heir by descent. Their lands are therefore subject to the payment of the debts of Basil Abrams.

If the deed from B. Abrams to Wills, inuring as it does by virtue of the statute to the benefit of his heirs, be considered as a voluntary conveyance, without valuable consideration from him to

them, the effect is the same, for by the statute of Elizabeth, then in force in the territory, as well as by the principles of the common law, such voluntary conveyance is void as against creditors.

It is said that admitting this property liable to payment of the debts contracted by B. Abrams before the conveyance to Wills, there was not evidence to warrant the jury in finding him so indebted.

This was a question of fact submitted by the court to the jury for their determination, and the evidence fully justified the finding. It appeared that immediately after executing the deed to J. S. Wills, B. Abrams shut himself up and kept concealed, until a few days thereafter he left the country. He had, therefore, little or no opportunity of contracting debts, and after divesting himself of his property it is not presumable he would obtain extensive credit; and yet the auditors appointed under the attachment to adjust and examine the several claims against his estate, report a list of his creditors, to whom he was severally indebted in sums from $1.91¾ to $669.50, amounting in the whole to the sum of $1,996.22. In addition to this there was direct evidence of his indebtedness at the time of his executing the deed.

If the matter were even doubtful, it was the province of the jury to weigh the testimony and determine the fact, and the court ought not to disturb the verdict because the fact was not proved beyond doubt. It is sufficient that there was testimony going to establish the fact, especially in the absence of all proof to the contrary and after the lapse of twenty years.

But it is said that admitting the sale by the auditors under the attachment transferred to the purchaser all the interest that B. Abrams ever had in the lot in controversy, yet as the deed from Massie to Abrams was executed before Massie had obtained a grant from the United States, although subsequent to his entry and survey, 406] Abrams acquired but *an equitable interest, and the patent, after the death of Massie, having issued to his heirs, they acquired an estate by purchase, and the plaintiff claiming under a deed from their trustee has the legal estate.

This presents a question upon which the court have felt the most anxious solicitude, and upon which they have not arrived to a conclusion without doubt and embarrassment. It is a question of great interest to the inhabitants of the Virginia military district, as well as the parties to this suit.

414

Nothing is more common than for the holder of a Virginia military land warrant to make an entry of the same, cause it to be surveyed and recorded, go into possession of the lands designated in such entry and survey, reside thereon for years, making large and valuable improvements, and die without obtaining a patent which is afterward issued to his heirs. If those heirs acquire the estate by purchase from the government, they must at law hold the same free from the debts and contracts of their ancestor; if by descent, the estate in their hands will be liable to the payment of the debts of their ancestor in the same manner and to the same extent it would had the patents issued to him in his lifetime. The question whether heirs acquire an estate in lands so situate by purchase or descent, is one, therefore, of great importance.

Nathaniel Massie, as early as 1795, made an entry of 1,900 acres, including the lands in controversy, in the books of the principal surveyor of the Virginia military district, and within a short time thereafter, caused a survey thereof to be made and recorded in conformity to the Virginia land law. He had done everything incumbent upon any holder of a warrant to appropriate the lands described in his survey, and had entitled himself to a patent therefor. He had, by the Virginia land law, acquired an indefeasible estate in the lands, and by our statutes it was subject to taxation, dower, and many other incidents of real estate.

In Kentucky, where the titles to a large portion of the real property depend upon the location conforming to the Virginia land laws, it has been held that an entry or survey is an inchoate, legal title, and that lands so held will descend, may be devised, or aliened, and are subject to be sold on execution issuing from a court of law. Thomas v. Marshall, Hard. 19. It would seem to follow, as a necessary consequence, *that it must be considered as [407 legal assets in the hands of the heir, subject to the payment of the debts of the ancestor. The heir inherits it as he would any legal estate to which the ancestor had an imperfect or incomplete title.

The act of Congress of August 10, 1790 (1 U. S. Laws 252), to enable the officers and soldiers of the Virginia line, on continential establishments, to obtain titles to certain lands lying northwest of the river Ohio, etc., after various provisions respecting the locations and surveys of said lands, directs that the President shall cause letters patent to be issued for the lands designated in said entries to the persons originally entitled thereto, their

heirs or assigns, or their legal representatives, their heirs or assigns. It is by virtue of this provision that the patent issued to the heirs of N. Massie. It is because they, standing in his place and representing him, are entitled to the same rights he had at his death. They take the same interest he would have taken had the patent issued to him in his lifetime.

The recitals in the patent show the consideration upon which it issued. The entry of the ancestor, the warrant under which it was made, the survey had thereon, and the acts of Congress regulating the appropriation of the land and the issuing of the patent, are all referred to, and all show it was not a gift by the government to the heirs of Massie, but that it was the execution of a trust in his favor, so far as the same could be executed after his death, by transferring to his heirs the naked legal title to lands which he had fully appropriated and for which he was in his lifetime entitled to a patent. There is no pretense of any consideration moving from the heirs for the grant under which it is claimed they hold as purchasers; on the contrary, the patent furnishes conclusive evidence that the consideration moved from the ancestor; that it was the services for which the warrant therein named issued, the location and survey in conformity to law, that caused the emanation of the patent. The ancestor had fully and legally appropriated the land. The naked legal title remained in the United States, as trustee, at the time of Massie's death, and his heirs procuring that legal title by virtue of the act of Congress of 1790, vested in them no greater or other estate than their ancestor would have taken had the patent issued in his lifetime.

408] *It was said in Shelly's case, 1 Rep. 98: "When the heir takes anything which might have vested in the ancestor, the heir should be in by descent. Then, although it first vested in the heir, and never in the ancestor, yet the heir shall take it in the nature and course of descent," and the principle was adopted by the court in giving judgment. In Wood's case, reported in 2 Rolle, determined in the court of wards, 3 Eliz., and recognized as law in Shelly's case, it was held " that if a man seized of the manor of S. covenants with another that when J. S. shall enfeoff him of the manor of D., then he will stand seized of the manor of S. to the use of the covenantee and his heirs. The covenantee dies, J. S. enfeoffeth the covenantor, the heir shall be adjudged in course and nature of descent, and yet it was neither a right, title, use, nor action that

descended, but only a possibility of a use which would neither be released nor discharged, yet it might, if the condition had been performed, have vested in the ancestor."

It will be readily perceived that this case is stronger in most of its features than the case at bar. The covenantee had no estate or interest in the land; none was to arise except upon the happening of an uncertain event which did not take place until after his death. In the present case; the ancestor had done all that was required by law to perfect his claim to a grant from the government. His estate was not dependent upon any uncertain event. There was no contingency which could enlarge or diminish his estate, the mere form of sealing the grant was only wanting to evidence by the highest and best title known to our laws, his interest in the lands. He could have assigned the entry and survey, and the assignee would have been entitled to a patent in his own name, or he could have devised it, and the devisee would have had an indefeasible estate. He could have maintained ejectment against any person not having a grant from the government. In short, by his warrant, entry, and survey, he had acquired an incomplete or inchoate legal title to the land designated in his entry; this right and title was not destroyed by the death of the ancestor, but descended to the heir as part of his estate; and if a patent afterward issued to the heir it does not enlarge his estate or increase the quantum of his interest in the land, but changes *the [409 evidence of his right from an entry and survey to a grant from the government in whom the mere legal title was vested in trust for those who should legally appropriate the land.

The case of Chapman v. Dalton, Plowd. 284, is, although not strictly analogous, illustrative of the same principle. D., the defendant, leased land for twenty-one years to J. C., and covenanted with lessee to make to him and to his assigns a good lease for twenty-one years, to commence immediately after the end of the first term; the lessee dies, having appointed an executrix; the executrix makes her executor and dies; the first term expires. It was held that the executor of the executrix of the covenantee should have an action of covenant for the second lease, and that it would, in his hands, be legal assets. The reasons of the court are not given in the report, but the decision is obviously on the ground that as the covenant was made with the first testator, the title thereto was derived from him to the plaintiff, and that which is

417

done, in performance of the covenant, ought to be in the plaintiff, in the same degree, as the covenant was in him, so that he shall have the lease in the like manner as he had the covenant.

If a lease, made to an executor in performance of a contract with the testator, would be legal as contradistinguished from equitable assets, in the hands of such executor, and for the reason that the right to such lease was derived from the testator, then it would seem that, by analogy, the heir would take by descent those lands, the right to which the ancestor had by contract with government, and in performance of which contract a patent had issued to the heir.

It was held by the court of appeals in Kentucky, in lessee of Gist's heirs *v.* Robinet, 3 Bibb, 2, that a right to land, under the proclamation of 1763, neither located nor surveyed, could be devised; and although the devisor, after making the will, procured a warrant, caused a survey of the lands to be made, obtained a grant therefor, and died without republishing his will, it was decided that the devisee should hold the lands, the court at the same time recognizing the principle that lands acquired after the making of a devise could not pass thereby. In this case, although the warrant, entry, survey, and grant were all after the devise, 410] yet they were all in execution of, and had reference to *the proclamation of 1763. By the issuing of the grant to the devisor, subsequent to the making of the will, he did not acquire a new estate; it was not, in the language of the books, lands acquired after making the devise, or they would not have passed by the will, but descended to the heir.

"In case of an exchange, one of the exchangers enters, the other dies before entry; now the heir of him that had not entered may enter, and he shall be in by descent, although the father never had anything in it." Jenk. 249; 14 Vin. 260. This is on the same principle recognized in Shelly's case, that if the act, which is to perfect the title to the estate, might have taken place during the life of the ancestor, the heir shall be in by descent, although in fact the title was first perfected by the heir, and by his act. In the case at bar, the only act necessary to perfect the title in Nathaniel Massie was the sealing the patent. This act might have taken place in his life, and would have perfected in him the legal title to the lands designated in his survey; the legal title is, after his death, perfected in his heirs by the doing of the only act necessary

to complete it. It would seem to result, from the authorities cited, that they would be in by descent, and not by purchase.

In the case of Smith *v.* Trigg, 8 Mod. 23, it was held that if a copyholder surrender to the use of his will and devises to his heir, and then dies before admittance, the heir, after admittance, shall be in by descent.

In the case of Marks *v.* Marks, 10 Mod. 425, where lands were devised to be for life, remainder to B. in fee, provided that if C., within three months after the death of A., the tenant for life, should pay B. five hundred pounds, then to C. and his heirs. C. died during the life of the tenant for life, who afterward dies, and it was held that the heir of C. should be allowed to perform the condition of paying the money to B., and that he should take the land in course of descent from his ancestor C. Here, by the will, a mere executory contract is limited to the ancestor, without in terms being extended to his heirs, and by performance of the condition the estate might have vested in him. The right to perform this condition descends to the heir; the vesting of the estate is a necessary consequence of such performance, and the court therefore hold that the heir *shall be in the estate by descent, [411 because the right to perform the condition upon which the estate depends came to him by descent.

It is a general rule that the heir shall not take by purchase when he may take the same estate in the land by descent. 7 Cranch, and the authorities there cited.

If a man devises to his heir at law an estate, neither greater nor less than he would have taken without such devise, he shall be adjudged to take by descent, even though it be charged with incumbrances. 2 Bl. Com. and authorities there cited.

In Vent. 372, the court say it is a long-established rule that "a man can not, either by conveyance at the common law or by limitation of uses or devise, make his right heir a purchaser."

The court are of opinion that as the patent must have issued to Nathaniel Massie, had he been alive at its emanation, as he had at the time of his death an inchoate legal title to the lands designated in his survey, which could be transferred, was subject to dower, the payment of taxes, and many other incidents of real estate; as he had a right to a patent therefor, which right vested at his death in his heirs, and the patent issued to them from necessity, occasioned by his death; that they, standing in his place, and

representing his rights, are, by the principles of the common law, in this estate by descent, and not by purchase.

This opinion renders it unnecessary to give any construction to the two acts of the legislature, vol. 18, p. 93, and vol. 19, p. 80, appointing a trustee for the heirs of Nathaniel Massie, deceased, or to determine the effect upon this case of the provisions therein contained, that the title which shall be acquired by said heirs, by virtue of any proceedings under said act, shall be considered in all courts as being taken by descent.

The only remaining question necessary to be considered is, whether the heirs of Nathaniel Massie, and those claiming under them, are estopped from denying his title to the lots in controversy, or, in other words, whether the patent inures to the benefit of the purchasers from Massie, and those deriving title from such purchasers.

Massie, after making his entry and survey, and before the issuing 412] of a patent, conveyed the lot in question to Basil *Abrams for a valuable consideration, by deed of bargain and sale, with covenants binding himself and his heirs to warrant and defend the title.

The authorities, both English and American, abundantly and clearly show that had N. Massie, after executing his deed to B. Abrams, acquired, by patent from the government or otherwise, a perfect title to the lands conveyed by him, he, his heirs, and all others claiming under him, would have been estopped from setting up the after-acquired title to the prejudice of his grantee. 1 Ld. Raym. 729; 12 Johns. 201; 13 Johns. 316; 4 Bibb, 436. In Coke Litt. 352, a, it is expressly said that privies in blood, as the heir, are bound by, and may take advantage of estoppels.

The heirs of Massie, standing in his place and inheriting from him, are bound by his warranty, and estopped by his grant from controverting the goodness of his title at the time he conveyed.

If the heirs of Massie could recover these lands on the ground that their ancestor, when he conveyed, had not a perfect legal title, they, claiming by descent from him, would be responsible in consequence of such recovery to his grantee, and those claiming title from him, upon the covenants of warranty contained in his deed, and it is to avoid this circuity of action that the heir has been held to be estopped from denying the title of his ancestor.

This doctrine would not apply were they purchasers from gov-

ment; but having derived all their interest in this estate by descent from their ancestor, Massie, they are estopped by his grant, and bound by his covenants, in which they are named.

We have no doubt that N. Massie, after his entry and survey, had a right to dispose of and alien the lands included in such survey; and when a patent afterward issued either to him or his heirs, whereby the legal title was perfected, it inured to the benefit of his grantee, and all persons claiming under such grantee, so as to perfect their title.

This opinion renders it unnecessary to examine the title of the plaintiff to the lot in controversy; the defendant having the legal title is entitled to judgment upon the verdict. The motion for a new trial must be overruled.

---

### *Richard Douglas v. John Waddle. [413

*Indorsers—Securities.*

Indorsers of promissory notes, indorsed for the use and accommodation of the drawer, are co-securities, and the last indorser can not recover more than a contributable share against a previous indorser.

This was an action of assumpsit. The declaration was by the indorsee of a promissory note against his immediate indorser; it contained also the common money counts. The cause was tried in the supreme court of Ross county, and a verdict given for the defendant. A motion was made for a new trial, and the decision of the motion referred to this court for decision.

The facts were these: On the 6th of October, 1818, a note, drawn by James Barnes, payable to the plaintiff, Douglas, and indorsed by Douglas and the defendant, Waddle, was discounted by the office of discount and deposit of the Bank of the United States at Chillicothe, where it was made payable, and the proceeds drawn upon the check of Waddle, the last indorser, and carried to the account of Barnes, the drawer. Though treated in form as a real note of business, it was, in fact, for the accommodation of Barnes, the drawer. Four notes were successively drawn, indorsed, and